**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **MICHAEL G. STAG, L.L.C.,** | * | **CIVIL ACTION NO. 18-3425** |
| **SMITH STAG, L.L.C.,** | * | |
| **and MICHAEL G. STAG** | * | **SECTION: A (2)** |
| | * | |
| **VERSUS** | * | **JUDGE: ZAINEY** |
| | * | |
| **STUART H. SMITH, L.L.C.** | * | **MAGISTRATE:   WILKINSON** |
| **and STUART H. SMITH** | * | |
| | * | **JURY DEMAND** |

**\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \***

**SECOND SUPPLEMENTAL, AMENDED, AND RESTATED COMPLAINT**

**NOW INTO COURT**, through undersigned counsel, come Complainants, Michael G. Stag, L.L.C. ("Stag, L.L.C."), Stag Liuzza, L.L.C. (formerly known, and referred to hereinafter, as "Smith Stag, L.L.C."), and Michael G. Stag ("Stag") (collectively the "Stag Parties" or "Complainants"), who, pursuant to Rule 15(a)(1) of the Federal Rules of Civil Procedure, submit their Second Supplemental, Amended, and Restated Complaint in this matter, as follows:

**PARTIES**

1. Complainants Stag, L.L.C. and Smith Stag, L.L.C. are both limited liability companies organized under the laws of Louisiana, each with its principal place of business in Orleans Parish. The sole member and manager of both Stag, L.L.C. and Smith Stag, L.L.C. is complainant Stag who resides and is domiciled in Orleans Parish. Because a limited liability company is a citizen of every state in which a member is a citizen, Stag, L.L.C. and Smith Stag, L.L.C. are both citizens of Louisiana.

2. Defendants herein are Stuart H. Smith, L.L.C. ("Smith, L.L.C.") and Stuart H. Smith ("Smith") (collectively the "Smith Parties" or "Defendants"). Smith, L.L.C. is a limited liability company organized under the laws of Louisiana with its principal place of business in Orleans Parish. The sole member of Smith, L.L.C. is Smith. Upon information and belief, Smith maintains

his domicile in Florida and is accordingly a Florida citizen.  Because a limited liability company is a citizen of every state in which a member is a citizen, Smith, L.L.C. is a citizen of Florida.

## JURISDICTION AND VENUE

3.  Jurisdiction is vested with this Honorable Court, pursuant to 28 U.S.C. § 1332, because complete diversity exists between the parties, as the Stag Parties are Louisiana citizens, and the Smith Parties are Florida citizens, and the amount in controversy exceeds $75,000.00, exclusive of interests and costs.

4.  This Court has personal jurisdiction over the Smith Parties, because the Smith Parties have sufficient minimum contracts with the State of Louisiana, and the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice.

5.  Venue is proper in this judicial district, as the parties conduct business within the jurisdiction of this Honorable Court.

6.  This Court has the authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

## FACTUAL BACKGROUND

**A.    Introduction**

7.  Smith Stag, L.L.C. was founded in 2002 by Smith, L.L.C. and Stag.  For more than 15 years, Smith Stag, L.L.C. has represented a variety of clients in litigation involving environmental pollution, mineral royalty disputes, toxic and radioactive materials exposure, defective drugs and medical devices, personal injury, accident, and wrongful death.

8.  This suit is a civil action for declaratory relief and money damages arising out of the impossibility of one of the objects and causes of an Agreement by and between Smith, L.L.C. and Stag, L.L.C., to which Smith and Stag intervened and agreed to likewise be bound, entered

into on the 8th day of June, 2015 (hereinafter the "2015 Agreement"), and in the alternative, mutual mistake, or detrimental reliance by the Stag Parties on representations made by the Smith Parties. A copy of the relevant excerpts of the 2015 Agreement is filed in the record at Docs. 1-1, 1-2, and 1-3.

9.      The 2015 Agreement was entered into after Smith, L.L.C. withdrew as a member of Smith Stag, L.L.C., liquidating Smith, L.L.C.'s two-thirds (2/3) interest in Smith Stag, L.L.C. Smith, L.L.C. withdrew as a member of Smith Stag, L.L.C., purportedly due to a grave illness which caused Smith to retire from the legal profession.

10.      At and around the time of his withdrawal, Smith represented that he was gravely ill, unable to continue the practice of law, and would elect for a "Preferred Withdrawal" as provided and defined in the 2006 Operating Agreement for the firm due to his illness. Preferred Withdrawal allows a member to withdraw and relieves the member from the obligation of having to fund his share of the ongoing financial obligations of Smith Stag, L.L.C. for a period of nine (9) months, as would otherwise be required by a "Nonpreferred Withdrawal." The Stag Parties relied on these representations of the Smith Parties.

11.      The 2006 Operating Agreement provides that in order for a Member to qualify for Preferred Withdrawal by disability, the Member must be unable, due to sickness or accident, to perform the substantial and material duties of the Member's profession for more than ninety (90) days. The Smith Parties represented to the Stag Parties that Smith qualified for Preferred Withdrawal on the grounds of disability as defined by the 2006 Operating Agreement. The Stag Parties relied on the representations of the Smith Parties that Smith was entitled to claim Preferred Withdrawal by disability. Upon information and belief, although Smith was diagnosed with a

disease, at the time of his withdrawal on March 1, 2015, he was not in fact disabled in a manner that qualified for Preferred Withdrawal as defined by the 2006 Operating Agreement.

12. Upon information and belief, the substantial financial benefit of a Preferred Withdrawal motivated Smith to seek a Preferred Withdrawal. It is estimated the Smith Parties benefitted by avoiding approximately one million dollars ($1,000,000.00) in payments for Smith Stag, L.L.C.'s obligations over nine (9) months.

13. Upon information and belief, the uncertainty of a pending attorney disciplinary action against Smith related to his conviction for violation of Louisiana's cyberstalking law, which had the potential to cause a Nonpreferred Withdrawal of Smith, L.L.C. if Smith were disciplined to the extent of being suspended from the practice law in the State of Louisiana, provided motive for Smith to seek a Preferred Withdrawal at the time when he chose to give notice of his withdrawal from Smith Stag, L.L.C.

14. At the time the 2015 Agreement was effective, made, and entered into, based upon the representations made by Smith and relied upon by the Stag Parties, none of the parties to the 2015 Agreement believed Smith would ever recover sufficiently to ever return to the practice of law. Smith represented that he was disabled and unable to continue with the practice of law. Further, because he would not return to the practice of law, the Stag Parties could continue the law firm with the name Smith Stag. The purported disability of Smith, his representations that he was permanently disabled and therefore would be unable to ever return to the practice of law, and continued use of the name Smith Stag by the Stag Parties were each principal causes for the execution of the 2015 Agreement, and this was understood by all parties to the Agreement. Of these principal causes, only the continued use of the name Smith Stag by the Stag Parties provided any material benefit to the Stag Parties.

4

15. However, since that time, Smith has apparently made a fortuitous medical recovery.

16. In a letter dated March 27, 2018, Smith announced that because of his fortuitous recovery, he intended, based upon his physician's advice, to return to practicing law.

17. Although the Stag Parties are pleased to learn of Smith's fortuitous recovery, Smith's return to the practice of law, as explained in greater detail herein, rendered performance of material provisions of the 2015 Agreement impossible.

18. Smith's stated intent to return to practicing law, based upon his physician's advice, further demonstrates the existence of an actual case or controversy between the Stag Parties and the Smith Parties. Further, after the filing of the initial Complaint in this action, Counsel for the Smith Parties notified the Stag Parties that Smith had returned to the practice of law and demanded that Smith Stag immediately cease and desist use of the Smith name. As a result of Smith's return to the practice of law, the Stag Parties were forced to change the name of the law firm, causing the loss of brand recognition, good will, and other financial losses, including Smith's competition for business with Smith Stag. The Stag Parties have also already incurred out of pocket expenses and damages related to the inability to continue the use of the name Smith Stag.

19. In the alternative, if contrary to Smith's representations about his health and disability, the possibility for his recovery and return to the practice of law was foreseeable by Smith at the time the 2015 Agreement was effective, made, and entered into, this intention was not disclosed to the Stag Parties, and the Stag Parties would not have obligated themselves to the 2015 Agreement, as written.

20. In the further alternative, if Smith's representations that he was disabled to the point of having the inability to perform the substantial and material duties of the Member's profession

for more than ninety (90) days were a misrepresentation or suppression of the truth, then the Stag Parties would not have obligated themselves to the 2015 Agreement, as written.

21.     Smith knowingly agreed to allow the Stag Parties to continue to use the name "Smith Stag, LLC," and Smith knew that this was a principal cause for the Stag Parties to enter into the 2015 Agreement. In fact, in one exchange rationalizing these increased payments to the Smith Parties, Smith wrote to Stag: "I am giving you my entire life's work minus some fees on current cases.  You are not paying anything for the goodwill, the knowledge base and future business and success my 27 years of work will bring in the future.  I know I am asking for some lagniappe here and believe I have reason for some indulgence from you."

**B.     The 2015 Agreement Required Bilateral Performance.**

22.     Effective March 1, 2015, Smith, L.L.C. withdrew as a member of Smith Stag, L.L.C., as permitted under Section 5.3 of the 2006 Operating Agreement of Smith Stag, L.L.C., as a Preferred Withdrawal due to Smith's disability.

23.     Under the terms of the 2006 Operating Agreement, upon the Preferred Withdrawal of a member, that member "shall be entitled to receive, in liquidation of the Member's Interest [] FIFTY PERCENT (50%) of the withdrawing member's interest in the attorney fees of all contingency fee cases under contract in [Smith Stag, L.L.C.] and full reimbursement of all costs paid by the withdrawing member in those cases to be paid at the end of the litigation, or otherwise when monies are received by any settlement or judgment." *See* 2006 Operating Agreement of Smith Stag, L.L.C. at 14 (Doc. 1-1 at 29).

24.     Preferred Withdrawal status, based on Smith's representations about his health, disability, and inability to return to the practice of law, further allowed the Smith Parties to avoid contributing to the Company's ongoing financial obligations, whereas Non-Preferred Withdrawal required continued funding of the Company's ongoing financial obligations for nine (9) months.

The last payment the Smith Parties made to contribute to the Company's ongoing financial obligations was made on or about February 12, 2015.

25.    Because Smith, L.L.C. had a two-thirds (2/3) membership interest in Smith Stag, L.L.C., and net losses and net profits from operation of Smith Stag, L.L.C. were to be borne by the members proportionately to their membership interests, the liquidated value upon Smith, L.L.C.'s withdrawal from Smith Stag, L.L.C. would have been one-third (1/3), or fifty percent (50%) of two-thirds (2/3), of the attorney fees of all contingency fee cases under contract in Smith Stag, L.L.C., and full reimbursement of all costs paid by the withdrawing member in those cases to be paid at the end of the litigation, or otherwise when monies are received by any settlement or judgment.

26.    Following the liquidation of Smith, L.L.C.'s membership interest in Smith Stag, L.L.C., the remaining two-thirds (2/3) of the contingency fee cases under contract in Smith Stag, L.L.C. would be allocated to Stag, the sole, remaining member of Smith Stag, L.L.C.

27.    However, given Smith's retirement and the value provided to Smith Stag, L.L.C. by guaranteeing the continuing use of Smith's name, the Smith Parties and Stag Parties negotiated the 2015 Agreement, deviating from the provisions of the 2006 Operating Agreement of Smith Stag, L.L.C. governing the Preferred Withdrawal of a member, *inter alia* increasing Smith, L.L.C.'s share of the contingency fee cases Smith Stag, L.L.C. had under contract from one-third (1/3) up to one-half (1/2) on a set schedule of cases.

28.    Because the Louisiana Rules of Professional Conduct permit a law firm, such as Smith Stag, L.L.C., to continue to include in its name the name of a retired member of the law firm, the Smith Parties and the Stag Parties provided that Smith Stag, L.L.C. may continue to use the name "Smith" in the name of Smith Stag, L.L.C. (Doc. 1-1 at 8). All parties to the 2015

7

Agreement were lawyers and understood this requirement for the continued use of the name by the Stag Parties.

29.    This continued use of the name Smith Stag, L.L.C. provided Smith Stag, L.L.C. with certain intangible value from the name recognition and reputation in the community built through years of zealous advocacy on behalf of its clients in litigation involving environmental pollution, mineral royalty disputes, toxic and radioactive materials exposure, defective drugs and medical devices, personal injury, accident, and wrongful death in Louisiana state and federal courts.  Smith Stag, L.L.C. has spent considerable time and money promoting this brand, both before and after the 2015 Agreement, to further increase this intangible value.

30.    As part of the agreement to permit the continued use of the name "Smith" in the name of Smith Stag, L.L.C., the Stag Parties agreed to increase the percentage of fees that would be due to Smith, L.L.C. if Smith Stag, L.L.C.'s contingency fee were ever collected for several cases from the one-third (1/3) provided for under the terms of the 2006 Operating Agreement of Smith Stag, L.L.C. up to one-half (1/2).  *See* Doc. 1-1 at 3 – 6. The Stag Parties further agreed to the Preferred Withdrawal based on the agreement regarding the continued use of the name Smith Stag and the Smith Parties' agreement to fulfill their obligations related to the name.

31.    From June 8, 2015 through the present, Smith Stag, L.L.C. has received monies from settlements or judgments in cases reflected in the schedules to the 2015 Agreement and has accordingly disbursed substantial fees to the Smith Parties.  However, Smith Stag, L.L.C. has yet to receive contingency fees in settlement or judgment in several of the cases reflected in these schedules but expects to collect additional monies in settlement or judgment in the future.

**C.       Smith's Fortuitous Recovery and Stated Intentions to Leave Retirement Make Continuous Performance of the Terms of the 2015 Agreement Impossible.**

32.    In a letter dated March 27, 2018, Smith has stated unequivocally that, with his health improved, he intends to leave retirement and, with his physician's advice, return to the practice of law.

33.    In this letter dated March 27, 2018, Smith also requested to copy certain materials stored electronically on Smith Stag, L.L.C.'s discovery drive, including work product, suggesting that, as a former managing partner/member, he had some proprietary interest therein.  This claim is contrary to the unambiguous provisions of the 2006 Operating Agreement of Smith Stag, L.L.C. *See* 2006 Operating Agreement of Smith Stag, L.L.C. Doc. 1-1 at 32.  ("**Section 7.12 _Title to Company Property_**.  Legal title to all property of the Company will be held and conveyed in the name of the Company.") (emphasis in original).

34.    Smith's imminent return to the practice of law makes it impossible for Smith Stag, L.L.C. to continue to use the name "Smith" in the firm name, despite the Smith Parties' and the Stag Parties' agreement to permit Smith Stag, L.L.C. to continue to do so.  As a result of this impossibility, Smith Stag, L.L.C. has changed its name to Stag Liuzza, L.L.C.

35.    Article 1877 of the Louisiana Civil Code provides: "When a fortuitous event that has made a party's performance impossible in part, the court may reduce the other party's counter performance proportionally[.]"

36.    Here, Smith's fortuitous recovery and present return to the practice of law has made performance of the Smith Parties' obligation to permit Smith Stag, L.L.C. to continue to use the name "Smith" in the name of the firm impossible.

37.    Therefore, the Stag Parties are entitled to have their counter performance, namely the percentage of fees due to Smith, L.L.C., reduced accordingly.

9

38.    In the alternative, the Stag Parties are entitled to dissolution of the 2015 Agreement and damages to compensate the Stag Parties for monies previously paid by the Stag Parties to Smith, labor and expenses incurred marketing the law firm with the continued use of the name "Smith," subsequent to the 2015 Agreement, labor and expenses requires to change the name of the law firm, and labor and expense to create a new logo, website, and social media pages for the law firm.

39.    In the alternative, Smith returning to the practice of law breached the 2015 Agreement.

40.    In the event that Smith foresaw his return to the practice of law at the time of the 2015 Agreement and represented the contrary to the Stag Parties, the Stag Parties are entitled to rescission of the 2015 Agreement, as well as damages and attorney fees. Indeed, there is evidence that Smith continued practicing law up and until August 21, 2015, after his purported, permanent disability effective March 1, 2015. *See* July 19, 2016 Declaration of Stuart H. Smith Pursuant to 28 U.S.C. §1746, attached hereto as Exhibit "B," and previously filed as Record Document No. 207-2 in *Gupta v. Merril Lynch, et al.*, in this Court's docket under Civil Action No. 12-1787. ("I provided legal services for the Gupta family beginning on June 3rd, 2012 **until August 21st, 2015**[.]") (emphasis added).

41.    Additionally, the Stag Parties are entitled to a declaratory judgment that Smith Stag, L.L.C., whose sole member and sole manager is Stag, is the sole owner of its property, including, *inter alia*, the discovery drive and its electronically stored contents, such as work product, and the Smith Parties have no right to retain any copy, in whole or in part, thereof.

**D.    Accounting of and credit and/or offset for overpayments of certain costs above those specified in the 2015 Agreement.**

42.    Section 5.4 of the 2006 Operating Agreement provides the following procedure for accounting and determining a withdrawing member's interest in the accounts receivables of Smith Stag, L.L.C., including case costs, as of the time of withdrawal:

> **Section 5.4 _Post Withdrawal Accounting_**. For any withdrawal, the Company shall perform an accounting of the current accounts receivables within (30) days, including case costs. At that time, the withdrawing Member's interest in the accounts receivables shall be fixed and said sum shall be noted in the company's books as a lien against the future recovery of those receivables as called for herein. The Company shall also note in the Company's books the Member's attorney fee lien as due to the withdrawing Member as set forth herein. Furthermore, the credit line identified in Section 2.7 shall be vacated and each member, will withdraw or otherwise shall pay off his share of said credit line within (90) days.

43.    Section 3(b) of the 2015 Agreement outlined precisely which case costs were due and owed to the Smith Stag, L.L.C. as of the effective date of Smith, L.L.C.'s withdrawal, including those case costs which would be written off on the books and records of Smith Stag, L.L.C. as uncollectible:

> Attached hereto as Exhibit "3 (b)(i)" is a list of all of the Case Costs due and owed to the Company as of February 28, 2015, plus all cases costs due and payable by the Company as of the Effective Date, which Case Costs are listed on Exhibit 3(b)(i)(a) (collectively, the "Case Costs," which will be paid in accordance with Sections 5.3 and 5.4 of the Operating Agreement). (SHS Agrees to pay to the Company no later than seven (7) days after the date of this Agreement, two-thirds (2/3) of the Case Costs on Exhibit 3(b)(i)(a).) Exhibit "3(b)(ii)" lists case cost receivables as of the Effective Date which will be written off on the books and records of the Company as uncollectible as of the Effective Date.

44.    Although the 2015 Agreement specified precisely which case costs were to be included in the accounting triggered by the Smith Parties' withdrawal, the Stag Parties have since learned that the Smith Parties received payments for additional amounts designated as case costs. These additional amounts were not listed on Exhibit 3(b)(i) and are qualitatively different from the

costs listed thereon. These overpayments were originally calculated by Smith Stag, L.L.C.'s bookkeeper, who has since left for employment directly or indirectly with the Smith Parties.

45.     These overpayments to the Smith Parties should be returned to the Stag Parties, or the Stag Parties should receive a credit or offset for these overpayments to the Smith Parties against any future amounts due to the Smith Parties.

**E.      The Smith Parties' never-ending, constantly-shifting audit request.**

46.     Over the years, the Smith Parties have made numerous demands for information related to settlement payments. Smith, individually and through his attorney, began making demands for information relatively soon after the agreement was memorialized. The Stag Parties provided information in response to these demands despite the fact that many of the demands were unsupported by the Agreement or Smith already possessed the information being demanded.

47.     In the aforementioned letter dated March 27, 2018, the Smith Parties also gave notice that they intended to conduct an audit of Stag Liuzza, L.L.C.'s books and records under the 2015 Agreement. The Smith Parties wrote:

> First, consider this letter as written request required under the Separation Agreement effective March 1, 2015, between Stuart H. Smith, Esq. and yourself, for an audit of all the files existing as of March 1, 2015. Our firm accountant, Mason Mauser [sic], will handle this task. Let us know when he may have access to the books and papers of the law firm to accomplish this task. You will receive a copy. As you requested, we have secured Karen's settlement statements and hope that those documents will expedite the process. In the interim, please provide a current report showing all cases that were being handled, whether by investigation, prosecution, or otherwise, as of March 1st, 2015 and the current status as of receipt of this correspondence.

48.     After receiving this request for access to the books and papers related to the 2015 Agreement, the Stag Parties arranged for Mr. Maurer to have access to Stag Liuzza, L.L.C.'s books and papers.

49.    Beginning on April 16, 2018, Mr. Maurer was given access to eight (8) binders which included all settlement documentation for which the Smith Parties had an interest and had settled at the time of the audit. These binders included the following:  (1) all settlement statements signed by clients, Stag Liuzza, L.L.C., and any co-counsel; (2) all checks paid from the settlement proceeds, including checks to the Smith Parties, Stag Liuzza, L.L.C., clients, or any other party requirement payment at the time of settlement; and (3) distribution sheets to the Smith Parties detailing the costs and fees paid.

50.    Mr. Maurer reviewed the contents of the binders, all of which had been previously provided or otherwise made available to the Smith Parties' accountant, Karen Smith.

51.    Following this voluminous provision of books and records, the Smith Parties continued to ask for the same documents, additional documents, documentation in a different format, and finally, access to books and records related to cases post-dating the departure of the Smith Parties from Stag Liuzza, L.L.C.

52.    After approximately two (2) days of reviewing the contents of the binders in person, the Smith Parties requested, and the Stag Parties agreed, to allow a third-party document service to photocopy and/or scan the records. These records included all necessary financial information relevant to the Smith Parties from the effective date of the 2015 Agreement (March 1, 2015) to the date of the audit.

53.    Thereafter, despite receiving all relevant financial information necessary to determine if the Smith Parties were properly paid on the cases in which they maintained an interest, a flood of requests was received from the Smith Parties for an additional audit of:  (1) documents already provided; (2) documents relevant to cases not subject to the 2015 Agreement; and (3) additional settlement documentation.

54.    The demands by the Smith Parties changed numerous times, making it unclear what the Smith Parties wanted and why they were entitled to it under the 2015 Agreement.

55.    On June 19, 2018, counsel for the Smith Parties sought settlement checks and back-up documentation for numerous cases. (Doc. 79-1) The responsive documents which were in the possession of the Stag Parties had already been provided to the Smith Parties, their accountant Karen Smith, and/or Mr. Maurer. However, despite this, the Stag Parties agreed to compile the documents specific to this request.

56.    On July 10, 2018, the Smith Parties requested an additional audit and for this audit to begin only six (6) days later on July 16, 2018 at 9:30 a.m. This demand did not comply with the ten (10) day notice provision in the 2015 Agreement, sought documents that had already been provided, and sought access to all bank statements, ledgers, and other financial information of Stag Liuzza, L.L.C., including information unrelated to the Smith Parties or cases in which they have or had an interest. Despite this pending litigation, neither the Smith Parties' counsel, nor the Stag Parties' counsel was copied on the correspondence.

57.    On July 12, 2018, two (2) days after the additional audit request made by the Smith Parties, an additional letter was sent seeking information and documents previously provided and additional documents that did not yet exist. The Smith Parties stated that it was their "understanding from defense counsel that numerous vaginal mesh cases have been settled" and complained that they had "received no information with regard to these recent settlements." At the time of this demand for documentation, documentation on all settled cases that were resolved had already been provided. Once again, despite this pending litigation, neither the Smith Parties' counsel, nor the Stag Parties' counsel was copied on the correspondence.

58. On July 16, 2018, without agreement to allow for an additional inspection of records, Mr. Maurer arrived at Stag Liuzza, L.L.C.'s office and requested that the Stag Parties' accountant provide access to all financial records of the firm. On this particular date, because no agreement had been made, the audit request was improper under the 2015 Agreement, and because this litigation was pending, Mr. Maurer was not permitted to review the private financial records of Stag Liuzza, L.L.C.

59. On July 17, 2018, Defendant wrote requesting an additional audit "within the next 7 days." Again, this demand did not comply with the ten (10) day notice provision in the 2015 Agreement and sought "original documents" but did not specify which documents were requested at that time.

60. On July 19, 2018, counsel for the Stag Parties provided seventy-five (75) settlement statements and one hundred ninety-eight (198) pages of back up documentation to counsel for the Smith Parties in response to the June 19, 2018 correspondence. All of these items were requested by the Smith Parties, despite being previously provided to the Smith Parties' accountant (Karen Smith), the Smith Parties themselves, and/or the Smith Parties' auditor (Mason Maurer).

61. Additionally, the Stag Parties provided additional information about the documents in their possession in an attempt to assist the Smith Parties with understanding the documents, because there appeared to be confusion:

> To the extent that a third party, such as another law firm or settlement administrator, drafted a settlement statement or had a client execute such a settlement statement, Stag Liuzza may not have such a settlement statement in its possession. For example, in the Dietz and Duhon cases, the distribution of settlement funds was handled by the Murray Law Firm and Stag Liuzza did not draft a settlement statement or receive one from the Murray Law Firm. Similarly, in Avandia, Stag Liuzza received the draft settlement statement, but did not receive settlement

statements executed by the clients because Stag Liuzza did not handle the distribution.[1]

62.    The Stag Parties extended offers to have representatives from their firm meet with representatives of the Smith Parties' firm to discuss any questions about settlement proceeds, documentation, or the systems documenting settlements and costs. However, rather than agree to this meeting, the Smith Parties and their representatives continued to send repeated requests for documents and information they had already received.

63.    On July 24, 2018, this Court held a status conference and ordered the Stag Parties to produce:

> A list of all open cases (including case name, case number, and court where pending) remaining from the schedule of active cases attached to the parties' 2015 Agreement, and the expense/cost ledger sheets for those cases. Plaintiffs will indicate whether offers/demands have been exchanged in those cases.[2]

64.    On August 8, 2018, in accordance with the Court's Order, the Stag Parties provided the Smith Parties with several excel files and PDFs containing the following:

(1)    A report from Needles containing a list of case costs (soft costs and hard costs) for all cases that were open as 3/1/2015 and remained open as of the date of the reports (499 pages);

(2)    Two reports from Peachtree containing lists of all hard costs for all cases that were open as of 3/1/2015 and remained open as of the date of the reports (850 pages);

---

[1] *See* Doc. 79-2. (Attachments omitted).

[2] Doc. 26

Continued on following page

16

(3)    A list of all cases open in Needles as of 3/1/2015 and that remained open as

of the date of the report with their caption, court, docket numbers (where

applicable), and the current status of those cases (138 pages).[3]

65.    The Stag Parties spent countless hours running reports and compiling information in a way that would be useful to the Smith Parties.  Despite receiving all settlement documentation since March 1, 2015, duplicate copies of documentation previously sent, and the comprehensive set of documents provided in response to the Court's order, the Smith Parties requested yet another audit:  "We want Mr. Maurer to have access to original documents and confirm trust account deposits. We are happy to have him execute a NDA to facilitate that process. We are only interested in files that Stuart has an interest in."[4]

66.    In the spirit of cooperation, the Stag Parties agreed to allow Mr. Maurer access to a list of deposits made into the trust account from March 1, 2015 to present, with the understanding that Mr. Maurer would execute an "eyes only" confidentiality agreement, given the sensitive nature of the information.[5]

67.    Additionally, the Smith Parties requested copies of all contracts with clients executed after March 1, 2015 which had since settled to confirm that the Smith Parties should not have received any such payment.  The Stag Parties agreed to produce copies of IOLTA bank statements and gathered the requested contracts for an audit to be conducted by Mr. Maurer on August 20, 2018 at 9:30 a.m.[6] Yet, Mr. Maurer did not show up for the additional audit on the agreed date and did not even call.

---

[3] Doc. 79-3. (Attachments omitted).

[4] *Id.*, p. 2.

[5] *Id.*

[6] Doc. 79-4. (Attachments omitted).

68.    On September 9, 2018, the parties participated in mediation. The Smith Parties indicated that access to the documents requested for the August audit—IOLTA bank statements and contracts executed with clients after March 1, 2015 and that had since settled—would help facilitate settlement negotiations. The Stag Parties agreed to permit an audit by Mr. Maurer on November 14, 2018 at 9:30 a.m., subject to the signing of an "eyes only" agreement.[7]

69.    On November 14, 2018, Mr. Maurer, Dennis Tizzard, and Karen Smith arrived at Stag Liuzza, L.L.C.'s office after 10:00 a.m. for inspection of the documents. All three signed the "eyes only" agreement agreed to by the parties' respective counsel. The agreement stated that the auditors were not "permitted to copy the Bank Statements in any way, shape, medium, or form, whether by copying, scanning, photo, video, transcribing, or by use of any other electronic means."

70.    After the IOLTA statements and requested documents were provided to the Smith Parties' auditors, they indicated that the documents were not helpful for the purpose of their audit. Counsel for the Smith Parties wrote: "This plan is not working as we had intended."[8] She later emailed: "The purpose of the audit is to identify all monies coming into your firm since Stuart left and identify those that Stuart has an interest in. To do this they will need to match money to client contracts."[9] The Smith Parties' auditors left Stag Liuzza, L.L.C.'s office after reviewing the documents provided to them.

71.    Later that day, Defendant's counsel sent a new list of demands for yet another audit, stating: "It is obvious we will need information beyond what Mike and I discussed."[10] These new requests included:

---

[7] Doc. 79-5.

[8] Doc. 79-6, p. 5.

[9] *Id.*, p. 4.

[10] *Id.*, p. 2.

- We need bank statements from all accounts where your clients deposited income and or case cost reimbursement received by your clients from 3/1/15 until present.
- We would like copies of the bank statements in pdf form so we can use the computer to enlarge them in order to ascertain the client number. According to my team, you have at least one IOLTA account copied.
- We want the general ledger files including check registers in excel for each account above (feel free to redact client names for cases not involving Stuart).
- For all checks written out of the accounts without a client number, we need the corresponding client contract to verify if Stuart has an interest.
- We would also like to know the last client number used where Stuart had an interest in the file.
- Confirmation of all cases that are completely dismissed.

For this new demand, the Smith Parties requested copies of the records to review offsite and stated "Eye only will not work with this amount of information." This position was completely inconsistent with all prior discussions regarding additional audits of Stag Liuzza, L.L.C.'s sensitive and confidential financial information.

72.    In addition to the constant additional audit requests, the Smith Parties have often requested the same documents multiple times.

73.    As settlement proceeds are distributed, the Stag Parties have provided settlement statements and supporting documentation with the checks to the Smith Parties. Despite this, the Smith Parties have stated that they did not receive documentation or, in some cases, simply failed to download documents from links provided.

74.    These duplicative requests are overly burdensome and unreasonably cumulative and duplicative.

75.    Moreover, production of documents multiple times is simply not required by the 2015 Agreement.

19

76.   However, the Stag Parties have continued to reproduce documents previously provided and explain systems and documents to the Smith Parties that were in place when Mr. Smith and his accountant (Karen Smith) were with Smith Stag (now Stag Liuzza, L.L.C.).

77.   The Stag Parties are hesitant to continue to expand the scope of this audit, because each time additional documentation is provided (usually documentation which had previously been provided to the Smith Parties, such as settlement statements), yet another request for additional materials is then received.

78.   The Smith Parties should not be permitted to continually expand the scope of their requests and demand the same documentation be repeatedly provided.

**<u>FIRST COUNT: FOR DECLARATORY RELIEF</u>**

79.   The Stag Parties repeat the allegations stated in the above paragraphs as if fully set forth herein.

80.   An actual and justiciable controversy exists between the Stag Parties and the Smith Parties regarding the terms and conditions of the 2015 Agreement, as well as any modification required by law due to the impossibility of certain provisions thereof.  This controversy is ripe and of sufficient immediacy to justify the issuance of a declaratory judgment.

**WHEREFORE**, the Stag Parties pray for this Honorable Court to declare the rights and obligations of the Parties, including but not limited to a declaration that the Stag Parties are entitled to reduce the percentage of fees that would have been or would be otherwise due the Smith Parties under the 2015 Agreement because of the impossibility of continued performance and/or error and/or breach of one or more provisions thereunder.

## SECOND COUNT: FOR DECLARATORY RELIEF

81.    The Stag Parties repeat the allegations stated in the above paragraphs as if fully set forth herein.

82.    An actual and justiciable controversy exists between the Stag Parties and the Smith Parties regarding title to property of Smith Stag, L.L.C., including, *inter alia*, the discovery drive and its electronically stored contents, such as work product, and the Smith Parties have no right to retain any copy, in whole or in part, thereof.  This controversy is ripe and of sufficient immediacy to justify the issuance of a declaratory judgment.

**WHEREFORE**, the Stag Parties pray for this Honorable Court to declare the rights and obligations of the Parties, including but not limited to a declaration that Smith Stag, L.L.C., whose sole manager and sole member is Stag, is and has at all relevant times hereto been the owner of certain property including the discovery drive and its electronically stored contents, and the Smith Parties have no right to retain any copy, in whole or in part, thereof.

## THIRD COUNT:  IN THE ALTERNATIVE, FOR DECLARATORY RELIEF AND DISSOLUTION OF THE 2015 AGREEMENT

83.    The Stag Parties repeat the allegations stated in the above paragraphs as if fully set forth herein.

84.    An actual and justiciable controversy exists between the Stag Parties and the Smith Parties regarding the terms and conditions of the 2015 Agreement, as well as dissolution thereof due to the impossibility of certain provisions thereof if modification by this Court is not possible or practicable.

85.    In the alternative to reducing the Stag Parties counter performance as prayed for in Count One, in the event this Court declares the 2015 Agreement dissolved because of the impossibility of certain provisions thereof, such dissolution only dissolves the 2015 Agreement

21

and does not affect or alter in any way the withdrawal by Smith, L.L.C., effective March 1, 2015, such that Stag remains the sole member and sole manager of Smith Stag, L.L.C. following the dissolution of the 2015 Agreement.  This controversy is ripe and of sufficient immediacy to justify the issuance of a declaratory judgment.

**WHEREFORE,** the Stag Parties pray for this Honorable Court to declare the rights and obligations of the Parties, including but not limited to a declaration that the 2015 Agreement is dissolved and Stag remains the sole member and sole manager of Smith Stag, L.L.C. because of the impossibility of continued performance of one or more provisions thereunder.

## FOURTH COUNT: IN THE ALTERNATIVE, FOR DISSOLUTION/RESCISSION OF THE 2015 AGREEMENT AND DAMAGES

86.     The Stag Parties repeat the allegations stated in the above paragraphs as if fully set forth herein.

87.     In the alternative to the remedies sought in Count One and Count Three, because a fortuitous event has made the Smith Parties' performance impossible in part, and/or because of lack of consent due to error, the 2015 Agreement should be declared dissolved, and damages should be awarded to compensate the Stag Parties.

88.     These damages include, *inter alia*:

   a.     return of monies previous paid by the Stag Parties to the Smith Parties, in an amount to be determined;

   b.     labor and expense marketing the law firm with the continued use of the name "Smith," including revamping the firm's logo and website following the 2015 Agreement;

   c.     labor and expense required to change the name of the law firm on letterhead, envelopes, business cards, bank accounts, other financial accounts, etc.; and

   d.     labor and expense to create a new logo, website, and social media pages for the law firm.

22

89.    In the event that the Smith foresaw his potential for improvement in his health and his potential for return to the practice of law at the time of the 2015 Agreement and represented the contrary to the Stag Parties, the Stag Parties are entitled to rescission of the 2015 Agreement, that the Smith Parties' withdrawal be declared Non-Preferred pursuant to the 2006 Operating Agreement of Smith Stag, LLC, as well as damages and attorney fees.

**WHEREFORE**, the Stag Parties pray for this Honorable Court to declare the 2015 Agreement dissolved and award damages in favor of the Stag Parties in an amount to be determined at trial.

## **FIFTH COUNT:  IN THE ALTERNATIVE, DETRIMENTAL RELIANCE**

90.    The Stag Parties repeat the allegations stated in the above paragraphs as if fully set forth herein.

91.    Because the Smith Parties made representations that they were not returning to the practice of law, in part, by formally agreeing to permit the Stag Parties to continue to use the name "Smith," and in light of the Louisiana Rules of Professional Conduct's prohibition on the continued use of the name of an attorney no longer associated with that firm, unless that attorney is deceased or retired, the Stag Parties reasonably relied on these representations, to their detriment, by agreeing to increase the proportions of monies to be paid to the Smith Parties upon their withdrawal from Smith Stag, L.L.C. and by spending additional money on advertising the firm, relying on the firm's continued ability to use the name "Smith."

**WHEREFORE**, the Stag Parties pray for this Honorable Court to award damages in favor of the Stag Parties for the damages suffered as a result of the Smith Parties' representations.

**SIXTH COUNT:  RETURN OF AND/OR CREDIT
FOR OVERPAYMENT OF CASE COSTS**

92.    The Stag Parties repeat the allegations stated in the above paragraphs as if fully set forth herein.

93.    The Stag Parties inadvertently made overpayments of case costs to the Smith Parties as provided in Section 3(b) of the 2015 Agreement and are entitled to a return of and/or credit for such overpayments.

**WHEREFORE**, the Stag Parties pray for this Honorable Court to award damages in favor of the Stag Parties for the return of and/or credit for overpayment of case costs and finding that the Smith Parties are not entitled to any further payments of any costs not specifically enumerated in Exhibit 3(b) of the 2015 Agreement.

**SEVENTH COUNT: DECLARATORY JUDGMENT AS TO THE RIGHTS, DUTIES,
AND OBLIGATIONS RELATED TO AUDIT RIGHTS OF THE PARTIES**

94.    The Stag Parties repeat the allegations stated in the above paragraphs as if fully set forth herein.

95.    An actual and justiciable controversy exists between the Stag Parties and the Smith Parties regarding the rights, duties, and obligations related to the audit permitted by the 2015 Agreement.  This controversy is ripe and of sufficient immediacy to justify the issuance of a declaratory judgment.

**WHEREFORE**, the Stag Parties pray for this Honorable Court to declare the rights and obligations of the Parties, including but not limited to the rights, duties, and obligations related to the audit permitted by the 2015 Agreement.

**JURY DEMAND**

96.    The Stag Parties demand a trial by jury of this matter pursuant to Federal Rule of Civil Procedure 38(b) for all issues so triable.

**PRAYER FOR RELIEF**

The Stag Parties pray that this Honorable Court enter judgment awarding them the following relief:

a.  a Declaratory Judgment finding that the Stag Parties are entitled to reduce the percentage of monies payable to Smith, L.L.C. under the 2015 Agreement due to the impossibility created by Smith's fortuitous recovery and return to the practice of law;

b.  a Declaratory Judgment finding that Smith Stag, L.L.C. is the sole owner of its property, including, *inter alia*, electronically stored information such as the discovery drive, and the Smith Parties have no right to rain any copy, in whole or in part, thereof;

c.  in the alternative to paragraph a immediately above, a Declaratory Judgment finding the 2015 Agreement dissolved and this dissolution in no way affected the March 1, 2015 withdrawal of Smith, L.L.C. as a member of Smith Stag, L.L.C. and/or the Smith Parties' withdrawal was Non-Preferred;

d.  in the alternative to paragraphs a and c immediately above, a Judgment dissolving the 2015 Agreement and awarding damages in favor of the Stag Parties and against the Smith Parties in an amount to be determined at trial;

e.  in the alternative to paragraphs a, c, and d immediately above, a Judgment in favor of the Stag Parties and against the Smith Parties for the damages resulting from the Stag Parties' detrimental reliance on the Smith Parties' representations;

f.  a Judgment awarding damages in favor of the Stag Parties for the return and/or credit for overpayment of case costs to the Smith Parties and finding that the Smith Parties are not entitled to any further payments of any costs not specifically enumerated in Exhibit 3(b) of the 2015 Agreement;

g.  a Declaratory Judgment declaring the rights, duties, and obligations of the Parties related to the audit permitted under the 2015 Agreement;

h.  a Judgment against the Smith Parties awarding the Stag Parties attorney's fees and costs; and

i.  any and all other relief that this Court may deem just and proper, whether such relief sounds in law or equity, and for trial by jury.

Respectfully Submitted,

*/s/ Stephen M. Gelé*
**RANDALL A. SMITH. T.A. (No. 2117)**
**STEPHEN M. GELÉ (No. 22385)**
**DYLAN T. LEACH (No. 35879)**
     OF
**SMITH & FAWER LLC**
201 St. Charles Ave., Suite 3702
New Orleans, LA 70170
Telephone: (504) 525-2200
Telecopy: (504) 525-2205
rasmith@smithfawer.com
sgele@smithfawer.com
dleach@smithfawer.com

***Counsel for Complainants, Michael G. Stag, L.L.C.,***
***Stag Liuzza, L.L.C., and Michael G. Stag***

26