UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| MICHAEL G. STAG, ET AL. | CIVIL ACTION |
| VERSUS | NO: 18-3425 |
| STUART H. SMITH, LLC, ET AL. | SECTION: "A" (2) |

**ORDER AND REASONS**

The following motion is before the Court: **Motion for Partial Summary Judgment (Disability) (Rec. Doc. 325)** filed by Stuart H. Smith, LLC and Stuart H. Smith ('the Smith Parties" when referred to collectively). Plaintiffs, Michael G. Stag, LLC, Stag Liuzza, LLC, and Michael G. Stag ('the Stag Parties" when referred to collectively) oppose the motion. The motion, submitted for consideration on May 26, 2021, is before the Court on the briefs without oral argument.[1]

**I.**

Stuart H. Smith ("Smith") and Michael G. Stag ("Stag") are former law partners of Smith Stag, LLC. In 2015, Smith withdrew from the firm due to a serious illness. The terms of the withdrawal were governed both by the firm's Operating Agreement and by a negotiated Separation Agreement between Stag and Smith. (Rec. Doc. 1-1). Smith's withdrawal was effected pursuant to the Preferred Withdrawal provision of the Operating Agreement, as opposed to the less financially attractive Nonpreferred Withdrawal

---

[1] Oral argument has been requested but the Court is not persuaded that oral argument would be helpful.

provision.[2] Preferred Withdrawal means "the Disability" of a member. (*Id.* at 19). Pursuant to the express terms of the agreement, the disability need not be permanent but rather means "the inability, due to sickness or accident of a Member to perform the substantial and material duties of the Member's profession ***for more than (90) days***." (*Id.* at 17) (emphasis added). Smith's position is that when he withdrew from the firm his prognosis was so grave that he did not envision being healthy enough to return to the practice of law. Paragraph 12 of the Separation Agreement states: "Name. "[Stuart H. Smith] and Stag agree that [Smith Stag, LLC] may continue to use the name 'Smith' in the name of the [firm]." (Rec. Doc. 1-1 at 8).

According to Smith he did not engage in the full-time or substantive practice of law for over three years due to his illness. Following medical treatment, Smith's condition improved and in 2018 he advised Stag that he would return to the practice of law at the recommendation of his physician. Although Louisiana Rule of Professional Conduct 7.10(g) allows a law firm to continue to include in its name a retired member of the firm, once Smith returned to the practice of law Smith Stag, LLC was required, in

---

[2] Under either withdrawal provision, the withdrawing member is entitled to receive, in liquidation of his interest in the firm, 50 percent of his interest in the attorney fees of all contingency fee cases under contract with the firm, and full reimbursement of all costs paid by the withdrawing member in those cases. (Rec. Doc. 1-1 at 29, Operating Agreements §§ 5.2 & 5.3). The key difference between the two forms of withdrawal is that under the nonpreferred type, the withdrawing member must continue to fund his share of the ongoing financial obligations of the firm for a period of 9 months, and if he fails to do so, those financial obligations are deducted from any fees and costs that are to be paid to him. The Preferred Withdrawal obviously presents a far more desirable option to the withdrawing member. The Stag Parties allege that the Smith Parties avoided paying approximately one million dollars ($1,000,000.00) to the Stag Parties when Smith withdrew under the Preferred Withdrawal provision. (SAC ¶ 12).

compliance with the Rules of Professional Conduct, to remove "Smith" from the firm name. The firm is now called Stag Liuzza, LLC.

The Stag Parties filed the main demand against the Smith Parties on March 29, 2018, seeking declaratory relief and damages. Stag alleges that continued use of "Smith" in the firm name was a primary cause for his willingness to allow Smith to withdraw from the firm on such favorable terms, which included a provision in the 2015 Separation Agreement to give Smith a larger allocation of fees than what he ordinarily would have been allowed under the withdrawal provisions of the Operating Agreement.[3] The Stag Parties characterize Smith's improved health and return to the practice of law as a "fortuitous recovery" and they allege that this "fortuitous event" has prevented them from using "Smith" in the firm name (a material provision of the Separation Agreement according to the Stag Parties). So having been deprived of the continued use of "Smith," and believing that they should be entitled to likewise reduce their obligations under the Separation Agreement, the Stag Parties ultimately began to withhold fees that Smith was owed under the Separation Agreement. The Stag Parties seek declaratory relief insofar as they ask the Court to declare that they are entitled to reduce the percentage of fees that would otherwise be owed to the Smith Parties under the Separation Agreement, or alternatively that the Court grant a partial dissolution of the Separation Agreement, or alternatively that the Court grant a full dissolution of the Separation

---

[3] According to the SAC, Smith had a two-thirds (2/3) membership interest in Smith Stag, LLC before he withdrew so under either withdrawal provision his post-withdrawal fee allocation would have been one-third (1/3) (50 percent of two-thirds), with the remaining two-thirds (2/3) of those fees belonging to Stag. (SAC ¶¶ 25, 26). But the Smith Parties and the Stag Parties altered that allocation as part of the Separation Agreement on a set schedule of cases such that Smith would receive a one-half (1/2) share instead of the one-third (1/3). (*Id.* ¶ 27). Stag contends that he agreed to this because he was going to be allowed to continue to use "Smith" in the firm name. (*Id.*).

Agreement and award damages (related to the inability to continue to use the name "Smith Stag").

On June 28, 2018, the Stag Parties filed their First Amended Complaint against the Smith Parties, and in this pleading they suggested that when Smith sought Preferred Withdrawal and negotiated the Separation Agreement, he might have overstated the graveness of his health problems as well as the extent and expected duration of his disability. (Rec. Doc. 15, First Amended and Restated Complaint). By the time that the Stag Parties filed their Second Amended Complaint ("SAC") against the Smith Parties on June 19, 2019, they were claiming that Smith, although diagnosed with a disease, was not "disabled" for purposes of the firm's Operating Agreement, notwithstanding his representations to the contrary. (Rec. Doc. 116, Second Supplemental, Amended, and Restated Complaint). The Stag Parties even alluded to the possibility that Smith might have made misrepresentations or suppressed the truth about his diagnosis when he sought the Preferred Withdrawal from the firm and negotiated the Separation Agreement. The Stag Parties also suggested that Smith might have been motivated by more than concerns for his health when he withdrew from the firm in March 2015.

The Smith Parties' position is that the higher percentage of fees that Smith was to be allocated pursuant to the Separation Agreement had nothing to do with the continued use of "Smith" in the firm name, and that the Stag Parties never indicated that this was a material provision in the agreement. According to Smith, all payments that he was to receive pursuant to the Separation Agreement were solely in consideration for his *past* contributions to the success of the law firm and were not consideration for any

promise that Smith would never recover from his illness or be able to practice law again. The Smith Parties point out that the Separation Agreement does not prohibit Smith from returning to the practice of law should his health improve, and it does not impose any penalty should he do so.

The Smith Parties have asserted counterclaims against the Stag Parties and allege a host of acts committed by Stag and members of his firm supposedly for the purpose of harassing Smith. (Rec. Doc. 122, Counterclaim). On November 27, 2019, the Court granted the Stag Parties' motion to dismiss some of those claims. (Rec. Doc. 215, Order and Reasons). On January 21, 2021, the Smith Parties supplemented their counterclaim with a request for injunctive relief pertaining to their audit rights under the Separation Agreement. (Rec. Doc. 299, First Supplemental Counterclaim).

Since the inception of this case it has been mired in personal animosity, harassment, and vexatious litigation practices committed by both sides. The Court has resolved numerous contested motions and has altered/vacated all of the assigned pretrial deadlines at various times at the parties' request, always with an eye toward promoting an amicable resolution to this matter. The Court stayed the case at the parties' request on more than one occasion after the parties advised that they were on the verge of a settlement. On December 17, 2019, the Court, having been informed that this matter was settled as to all parties and all claims, entered its standard 60 day order of dismissal. (Rec. Doc. 222, Order of Dismissal). Unfortunately, on April 27, 2020, the Court had to vacate that order of dismissal when it became obvious that the parties had not reached a meeting of the minds as to the terms of a binding settlement agreement. (Rec. Doc. 262). Simply, this case has had a tortuous and vitriol-laden history.

A jury trial is scheduled for October 18, 2021. (Rec. Doc. 295).

II.

The Smith Parties' motion for partial summary judgment seeks judgment as a matter of law as to Counts 1, 3, 4, and 5 of the Stag Parties' SAC, all claims that according to the Smith Parties are based on the Stag Parties' allegation that Smith misrepresented his health condition or that error arose from Smith's representations about his health condition. The Smith Parties explain that the purpose of their motion is to "prove" that Smith's health representations were not fraudulent, cannot constitute error, and that Smith met the contractual definition of "disability." (Rec. Doc. 325-1, Memorandum in Support at 2). According to Smith, what he said about his health condition was true, and Stag has no evidence to dispute this or to suggest that Smith was not disabled under the Operating Agreement when he withdrew from the firm. The Smith Parties posit that if the Court determines that Smith was "disabled" within the meaning of the parties' Operating Agreement then the Stag Parties' case is essentially over. (*Id.*). In support of their motion the Smith Parties have provided medical records, an expert report (attesting that Smith was disabled under the Operating Agreement), and evidence that both Smith's disability insurer and the Social Security Administration considered Smith to be disabled.[4]

In opposition, the Stag Parties characterize the Smith Parties' motion as being premature because key discovery remains to be completed. The Stag Parties argue that

---

[4] The Court is persuaded that the disability determinations by the private insurer and the Social Security Administration—determinations that are based on standards specific to those entities—are irrelevant to whether Smith was entitled to exercise the Preferred Withdrawal option when he withdrew from the firm and constitute hearsay.

there is already a plethora of evidence creating genuine issues of fact regarding whether Smith was unable to perform the substantial and material duties of his profession for more than ninety (90) days, in other words, whether he was in fact "disabled" under the Operating Agreement and entitled to Preferred Withdrawal. In fact, the Stag Parties contend that it has now become quite clear that Smith continued to practice law during the time that he claims that he was disabled.

The Stag Parties dispute the suggestion that if the Court determines that Smith was "disabled" within the meaning of the parties' Operating Agreement then the Stag Parties' case is essentially over. They also contend that even if the Smith's motion is granted it will be necessary for the rest of the case to be tried to a jury.

The Stag Parties argue that the parties to the Separation Agreement did not and could not have reasonably contemplated that Smith would return to the practice of law. Stag contends that he executed the Separation Agreement based on Smith's repeated and emphatic representations that he was disabled, and that he simply did not know about the totality of the activities of Smith for the year prior.

In short, the Stag Parties argue that there are genuine issues of material fact that preclude summary judgment as to Smith's disability status.

**III.**

Before delving into the thorny issue of disability at the invitation of the parties, the Court first must examine the substantive law that governs the Stag Parties' claims to ensure that the issue is material to their claims. A fact issue is "material" if its resolution could affect the outcome of the action. *Levy Gardens Parts. 2007, LP v. Commonwealth Land Title Ins. Co.*, 706 F.3d 622, 628 (5th Cir. 2013) (citing *Hamilton v. Segue*

*Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000)). If the issue of disability is material to the relief that Stag seeks via the main demand, then the Court must decide whether the issue should be determined by the jury.

It is undisputed that both Smith and Stag consented to the 2015 Separation Agreement and reached a binding agreement as to all of its provisions. While Stag filed this lawsuit in order to be relieved of certain obligations under the Separation Agreement, he agreed to everything that he now seeks to avoid or change, and the Separation Agreement as written accurately reflects the true agreement of the parties at the time when they executed it.[5] Importantly, <u>Stag agreed as part of the Separation Agreement that Smith was "disabled" for purposes of the Preferred Withdrawal provision</u>. (Rec. Doc. 1-1 at 1). And Stag knew at the time that he was doing so based solely on Smith's representations to him, having declined to ask for any supporting medical opinion(s). So even if Stag now questions whether Smith really was "disabled" for purposes of the Preferred Withdrawal provision, the gateway question that must be answered is whether Stag is entitled, under the controlling law, to revisit an issue that was contractually laid to rest in 2015 as part of the Separation Agreement. Without a proper legal mechanism that would allow Stag to now litigate the issue of disability and Preferred Withdrawal, it really doesn't matter that Stag now confesses that he was not fully informed about Smith's activities in the year prior, or that Smith might not have

---

[5] Contract reformation, which is a remedy designed to correct errors in a contract that does not express the true agreement of the parties, is not a potential remedy in this case because the Separation Agreement does reflect the true intent of the parties at the time that it was executed. *See Peironnet v. Matador Res. Co.*, 144 So. 3d 791, 808-09 (La. 2013) (citing *Wilson v. Levy*, 101 So. 2d 214, 215 (La. 1958); Saul Litvinoff, *Vices of Consent, Error, Fraud, Duress and an Epilogue on Lesion*, 50 La. L. Rev. 1, 45-46 (1989)); *Matthews v. Emerson*, 141 So. 3d 346, 350 (La. App. 2nd Cir. 2014).

actually qualified for Preferred Withdrawal, or that Stag now believes that he can convince a jury that Smith was actually practicing law when he was supposed to be unable to do so.[6]

One of the difficulties that the Court has faced in evaluating the parties' respective positions is that while the Stag Parties make a litany of allegations that they believe tip the equities of the case in their favor and should entitle them to relief, both their pleadings and their memorandum in opposition fail to adhere to a specific legal theory that would allow them to challenge matters contractually agreed to.[7] The only legal authority that the Stag Parties expressly cite in their SAC (the memorandum in opposition is virtually devoid of any legal authority) is Civil Code article 1877, which states:

> When a fortuitous event has made a party's performance impossible in part, the court may reduce the other party's counterperformance proportionally, or, according to the circumstances, may declare the contract dissolved.

Relying on this article, as the Court appreciates Stag's theory of the case under this article, Smith's recovery and return to the practice of law was a "fortuitous event," and allowing Stag to continue to use "Smith" in the firm name is one of Smith's

---

[6] Stag has cloaked all of his claims in terms of declaratory relief but the Declaratory Judgment Act is not a mechanism to have a court adjudicate issues that a party has no right to litigate under the controlling substantive law, which in this case is Louisiana law. The Declaratory Judgment Act does not create a cause of action in and of itself but merely provides a form of remedy, *Harris Cty. Tex. v. MERSCORP, Inc.*, 791 F.3d 545, 552 (5th Cir. 2015), and it does not make an issue justiciable simply because two parties are engaged in a "controversy" over it.

[7] One example of this is Count 5 of the SAC which is a detrimental reliance claim. The Court is aware of no aspect of Louisiana law that allows a party to repudiate contractual obligations based on detrimental reliance. And of course the Stag Parties cite to no such authority.

obligations under the Separation Agreement, the performance of which is now impossible since Smith has returned to the practice of law, so Stag should have his counterperformance reduced proportionally, and the specific counterperformance that Stag alights upon to redress his loss of the Smith name is the Special Allocation of fees, which gave Smith a more favorable fee split for certain cases than what the Operating Agreement would have otherwise allowed to a withdrawing member.

As to this cause of action, regardless of whether the relief rendered is reduction of fees owed under the Special Allocation or altogether dissolution of the Separation Agreement, the Court fails to understand how it provides a basis to revisit the issue of disability that Stag agreed to in the Separation Agreement, and whether Smith was entitled to the Preferred Withdrawal, which again Stag agreed to as part of the Separation Agreement. The Court reaches this conclusion because even if Stag could prove every element of the fortuity case that the Court has outlined above, this would not call into question Smith's preferred withdrawal from the firm. It would seem to the Court that implicit in this cause of action, which would characterize Smith's recovery and return to the practice of law as "fortuitous," is the underlying assumption that he was actually gravely ill (which he clearly was) *and not able to perform the substantial and material duties of his profession for more than (90) days.* After all, his recovery and return to the practice of law could hardly be characterized as "fortuitous" if the contrary were true. The disability definition in the Operating Agreement does not impose a permanence requirement. So in truth, a withdrawing member could satisfy the disability requirement for Preferred Withdrawal and still "fortuitously" return to the practice of law. And of course, while Stag can plausibly argue that continued use of "Smith" in the firm

name was the consideration for his agreeing to the Special Allocation of fees, it is not the consideration for Preferred Withdrawal because the Operating Agreement does not require that a withdrawing member provide consideration or any "performance" in order to avail himself of that provision. He need only meet the definition of "disability" provided in the Operating Agreement and in this case Stag agreed that Smith did. So for purposes of this particular cause of action the Court agrees with the Stag Parties' contention that the case would not be over if the Court concluded that Smith was in fact entitled to Preferred Withdrawal (disabled) when he withdrew from the firm. The Court simply fails to see how the disability issue raised in the Smith Parties' motion for partial summary judgment is material to the claim brought under Civil Code article 1877.

In fact, most of the allegations in the SAC and the arguments contained in the Stag Parties' opposition are not material to a "fortuity" claim brought under the Civil Code articles governing impossibility of performance. The Stag Parties' factual allegations and arguments mostly emphasize the contention that Smith was not really disabled (as he claimed to be) and therefore not entitled to Preferred Withdrawal, or that Smith misrepresented his health limitations or suppressed the truth, with Stag being in the dark about what was really going on in Smith's life. The Stag Parties allege lack of consent due to error although for some reason they do not cite the Civil Code articles governing vices of consent, La. Civ. Code art. 1948, *et seq.* And while they decline to be express as to who might have erred and failed to consent, the allegations regarding misrepresentations are obviously intended to convey that Stag erred, not because of his own lack of diligence in investigating what Smith was telling him, but because Smith was not forthcoming with him. But on the other hand, the Stag Parties also allege that

"none of the parties to the 2015 Agreement believed Smith would ever recover sufficiently to ever return to the practice of law," (SAC ¶ 14), and while this could possibly relate to the fortuity claim, it also resounds in mutual or bilateral error, which means that both parties were mistaken as to Smith's prognosis and this is of course inconsistent with the claim that Smith mispresented his condition to Stag. Again, the Court has found it difficult to follow the precise legal theory that the Stag Parties are pursuing after more than three years of litigation.

Of course, the legal theories available to Stag under Louisiana law are few because the relief that Stag seeks from the trier of fact in this case is to be relieved of contractual obligations that he agreed to in a contract that accurately reflects the true intent of the parties at the time that they executed it. In order for Stag to avoid those contractual obligations, the contract must be rescinded or dissolved, most likely in whole or maybe in part.[8]

The Separation Agreement has "the effect of law for the parties," and may be dissolved (rescinded) only through the consent of the parties (which is not happening here) or "on grounds provided by law." La. Civ. Code art. 1983. Under Louisiana law, consent may be vitiated by error, fraud, or duress.[9] La. Civ. Code art. 1948. Error vitiates consent only when it concerns a cause without which the obligation would not

---

[8] Stag makes clear that he does not want the entire Separation Agreement rescinded because he still wants Smith out of the firm and other aspects of the Separation Agreement are not objectionable. Stag therefore seeks a partial rescission of the Separation Agreement, with total rescission being somewhat of a last resort.

[9] Stag has never suggested that duress as a means of vitiating consent applies in this case. And Stag has never pleaded fraud even though some of his allegations are suggestive of fraud as that term is defined in Civil Code article 1953. Thus, the only vice of consent at issue in this case as far as the Court is concerned is error, which the Stag Parties did plead.

have been incurred and that cause was known or should have been known to the other party. La. Civ. Code art. 1949. Error may concern a cause when it bears on the nature of the contract, or the thing that is the contractual object or a substantial quality of that thing, or the person or the qualities of the other party, or the law, or any other circumstance that the parties regarded, or should in good faith have regarded, as a cause of the obligation. La. Civ. Code art. 1950.

Under Louisiana law, error that vitiates consent can manifest itself in two ways: both parties can be mistaken, in which case the error is mutual or bilateral, or only one party to the contract can be mistaken, in which case the error is unilateral. *Peironnet*, 144 So. 3d at 807. In both situations, the error for which relief may be granted 1) must affect "the cause" of the obligation, and 2) the other party must know or should have known "the matter affected by error was the cause of the obligations for the party in error," *i.e.*, that it was the reason he consented to bind himself. *Id.* (quoting La. Civ. Code art. 1949 & 1984 cmts. (b), (c)). In other words, both parties can individually be mistaken, in which case both parties are clearly aware the matter in error was the cause of their mutual obligations, thus vitiating the consent of both parties. *Peironnet*, 144 So. 3d at 807. Or one party can be mistaken and that mistake will vitiate consent if the other party knows or should have known. *Id.*

Rescission is a remedy available for both forms of error, *id.* at 809, but where the error is unilateral, the erring party who obtains rescission is liable for the loss sustained by the other party unless the latter knew or should have known of the error, La. Civ. Code art. 1952. In the case of unilateral error, the court may refuse rescission when the effective protection of the other party's interest requires that the contract be upheld. *Id.*

art 1952. In that case, a reasonable compensation for the loss he has sustained may be granted to the party to whom rescission is refused. *Id.*

When a party seeks rescission for his unilateral error, the question whether the error was excusable or inexcusable becomes pertinent because no relief will be given for inexcusable error. *Peironnet*, 144 So. 3d at 810 (quoting Litvinoff, 50 La. L. Rev. at 36-38). Whether an error is excusable or inexcusable is determined according to the circumstances surrounding the particular case. *Id*. The personal circumstances of the party claiming error, such as his age, experience, education, and profession are to be taken into account. *Id.* An error made by a professional person concerning a matter within his field of expertise would no doubt be regarded as inexcusable. *Id.* A party hoping to convince the trier of fact that his unilateral error was excusable would attempt to demonstrate that he did not fail to take elementary precautions that would have avoided his falling into error, such as making certain that he was reasonably informed. *Id.* Clearly, *to* determine whether the error is excusable or inexcusable the trier of fact must delve into the subjectivity of the party alleging error. *Id.*

Even with bilateral error where the granting of relief can be less problematic, *Matthews*, 141 So. 3d at 350, the error renders the contract merely a relative nullity, which can be either confirmed or deemed to never have existed, *Peironnet*, 144 So. 3d at 808 (citing La. Civ. Code arts. 2031 & 2033).

Relying on the allegations of error, which are suggestive of both mutual and unilateral error, Stag's theory of the case presumably (because he never clearly articulates how the Civil Code articles regarding error relate to his case) is that a principal cause of the 2015 Separation Agreement was that Smith's condition was so

grave that he was never going to be able to return to the practice of law (which again is different than "disability" for purposes of Preferred Withdrawal) and that neither Smith nor Stag knew or anticipated that he ever would, *i.e.*, they were both mistaken and therefore mutually erred as to this cause, and that based on this mutual error the contract should be rescinded for lack of consent. For a mutual or bilateral error case, which is premised on *both* parties being mistaken, misrepresentations really don't play a part and as with the fortuity claim the issue of whether Smith actually qualified for the Preferred Withdrawal (was disabled) is not material.

When unilateral error is the theory of the case, misrepresentations and suppression of the truth do play a part and the theory of the case would presumably be that a principal cause of the 2015 Separation Agreement was that Smith's condition was so grave that he was never going to be able to return to the practice of law (which again is different than "disability" for purposes of Preferred Withdrawal) and that while Smith might very well have known better, Stag didn't and was mistaken as to the principal cause because of Smith's misrepresentations and lack of candor and therefore Stag's unilateral error was excusable, and that based on Stag's excusable, unilateral error the contract should be rescinded.

As to this cause of action, *i.e.*, Stag's unilateral error as to Smith's "disability" status and also as to his ability to ever return to the practice of law (both errors having been allegedly induced by Smith's alleged misrepresentations and suppression of other facts), the Court agrees with the Smith Parties' contention that a favorable ruling as to disability would eviscerate at least part of the claim because if Smith was *actually* disabled under the Operating Agreement (and therefore entitled to exercise the

Preferred Withdrawal option) then the issue of error is moot insofar as Stag is claiming error with respect to agreeing to the Preferred Withdrawal. So the question of disability is material to this claim. But the issue of error would not be moot, however, as to Stag's belief that Smith would never be healthy enough to return to the practice of law because it bears repeating that the disability definition in the Operating Agreement does not impose a permanence requirement.

This case presents several factual questions, none of which the Court intends to take from the jury, including the issue of disability. This case will be tried to a jury on October 18, 2021. The motion for partial summary judgment as to disability is denied.

Accordingly, and for the foregoing reasons;

**IT IS ORDERED** that the **Motion for Partial Summary Judgment (Disability) (Rec. Doc. 325)** filed by Stuart H. Smith, LLC and Stuart H. Smith is **DENIED**.

June 28, 2021

_____
UNITED STATES DISTRICT JUDGE